## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN P. LAROCQUE and MICHAEL D. LAROCQUE, | ) ) ) | |
| Plaintiffs, | ) ) | **FILED: AUG 19, 2008** |
| v. | ) ) | No. 08CV4713 |
| IDEACAST, INC., a Delaware corporation, NATIONAL CINEMEDIA, LLC, a Delaware limited liability company, FREDERICK SMITH, RICHARD STEPHEN LUTTERBACH, and WILLIAM BLAIR & COMPANY, LLC, an Illinois limited liability company, | ) ) ) ) ) ) ) ) ) ) | JUDGE ZAGEL MAGISTRATE JUDGE BROWN RCC **DEMAND FOR JURY TRIAL** |
| Defendants. | ) | |

### COMPLAINT AND JURY DEMAND

Plaintiffs, John P. LaRocque and Michael D. LaRocque ("Plaintiffs or the "LaRocques") complain against Defendants IdeaCast, Inc., a Delaware corporation ("IdeaCast" or the "Company"), National CineMedia, LLC, a Delaware limited liability company ("NCM"), Frederick Smith ("Smith"), Richard Stephen Lutterbach ("Lutterbach") ( Smith and Lutterbach are referred to collectively herein as the "Individual Defendants"), and William Blair and Company, LLC, an Illinois limited liability company ("William Blair") as follows:

### Nature of the Action

1.      This is an action for securities fraud under federal and Illinois statutes, for fraud under federal statute, Illinois statute, and common law, for fraud-based claims under the federal racketeering statute, and for breach of contract.

2.      Defendants knowingly or recklessly made false and misleading statements of material fact in connection with the offering of stock of IdeaCast for sale to the Plaintiffs, and knowingly or recklessly failed to disclose material facts related to

IdeaCast's financial condition and business operations.  In addition, Defendants knowingly or recklessly failed to make statements of material fact necessary to make the statements they did make, in the light of the circumstances under which they were made, not misleading.  Among other things, key financial projections delivered to Plaintiffs to induce them to invest in IdeaCast were based upon facts and conditions that Defendants knew did not in fact exist or omitted facts and conditions that Defendants knew to exist and were therefore materially misleading.  Plaintiffs relied upon these false statements and unreasonable financial projections in deciding to invest in IdeaCast.  Had Defendants disclosed the true facts regarding IdeaCast's financial condition and business operations, Defendants would not have invested in IdeaCast.

3.     Accordingly, Plaintiffs bring causes of action for damages under section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 10b-5 promulgated thereunder, for rescission under Sections 12(a)(1) or 12(a)(2) of the Securities Act of 1933 ("1933 Act"), as well as for damages under Sections 12(F), 12(G), 12(H), and 12(I) of the Illinois Securities Law of 1953 ("Illinois Securities Law"), 815 ILCS 5 *et seq.*, and for rescission under Section 13(a) of that Law.

4.     Further, premised on these same knowing or reckless misrepresentations, which were made to induce Plaintiffs to purchase IdeaCast stock, and on which Plaintiffs reasonably relied, Plaintiffs bring actions under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.*, and for common law fraud.  These multiple counts of fraud in turn support their action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

5.     Finally, this is an action for breach of contract.  Defendants were

contractually obliged pursuant to an Investors Rights Agreement to provide Plaintiffs with notice prior to the issuance of new securities.  However, as part and parcel of their overarching, concerted and willful scheme to conceal material financial information from Plaintiffs, such obligations were breached.

### Parties

6.      IdeaCast is a Delaware corporation formed on May 7, 2007.  IdeaCast's headquarters are located at 1335 West Randolph, Suite 2D, Chicago, Illinois 60607. IdeaCast provides digital cable television advertising to purportedly captive audiences in places such as health clubs, airlines and amusement parks.

7.      Michael D. LaRocque and John P. LaRocque are common shareholders of IdeaCast.  The LaRocques are residents of the State of Illinois and the Northern District of Illinois.

8.      NCM is a Delaware limited liability company.  NCM is and was at all times relevant to this Complaint, a common and/or preferred shareholder of IdeaCast. At all relevant times NCM was the agent for and alter ego of National CineMedia, Inc., a Delaware corporation and the holding company for the limited liability company interests of NCM.  NCM is a significant shareholder of IdeaCast.

9.      Defendant Smith was at all times relevant to the allegations of this Complaint IdeaCast's Chief Executive Officer and a Director of the Company.  Smith was discharged for cause by the IdeaCast Board in or around February, 2008, amid allegations of breaches of fiduciary duty to the Company.   Smith currently exerts sufficient voting control to retain his seat on the IdeaCast Board.

10.     Defendant Lutterbach is and was at all times relevant to the allegations of this Complaint IdeaCast's President, Vice-Chairman and a Director of the Company. Lutterbach also served as the Chief Financial Officer of IdeaCast during certain

periods of time.

11.     Defendant William Blair is an Illinois limited liability company.  William Blair's headquarters are located at 222 West Adams Street, Chicago, Illinois 60606. William Blair is an investment firm whose services include providing public and private corporations with comprehensive capital formation and advisory services, including underwriting for initial or secondary public offerings, mergers and acquisitions advice, and private equity placement services.  William Blair entered into a relationship with IdeaCast to assist IdeaCast with its 2007 preferred and/or common stock offering.  In conjunction with this offering, William Blair, with IdeaCast management, prepared an "Executive Summary" and PowerPoint presentation that were delivered to potential investors in IdeaCast.

### Jurisdiction and Venue

12.     This Court has jurisdiction over this action pursuant to Section 22 of the 1933 Act, Section 27 of the 1934 Act, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.  The claims asserted herein arise under, or form part of the same case and controversy as claims that arise under, Sections 10(b) and 20(a) of the 1934 Act, Rule 10b-5 promulgated thereunder by the SEC, and Section 12 of the 1933 Act.

13.     Venue is proper in this District pursuant to Section 22 of the 1933 Act, Section 27 of the 1934 Act, and 28 U.S.C. §1391(b)(2).  IdeaCast is headquartered in this District and many of the acts giving rise to the violations complained of, including the dissemination of false and misleading public statements and financial information, occurred in this District.

**Factual Background**

A.     **Background**

14.     IdeaCast is in the business of providing what it describes as "out of home advertising" to purportedly captive audiences in places like amusement parks, health clubs, and other locations where television broadcasting is shown to a company's customers.

15.     IdeaCast requires two key contractual relationships in order to generate revenue.  First, IdeaCast must enter into contracts with advertisers to place their advertisements in desirable places.  The revenue provided to IdeaCast under these contracts is generally dependent on the number of times the particular advertisement is viewed by individuals.  Each view is known in the industry as a "view impression." The more "view impressions" that IdeaCast delivers to an advertiser, the higher IdeaCast's revenues will be.  Second, IdeaCast must enter into contracts with amusement parks, airlines and health clubs who will deliver the advertising to their customers.  The more of these contracts IdeaCast enters into, the more "view impressions" it will be able to deliver, and thus the greater its revenues will be.  The second group of contracts requires IdeaCast to have access to capital, however, as it is generally required to pay the complete installation costs for the equipment and labor at each health club and then to make periodic payments to health club chains, etc., in order to deliver advertising to the clubs' customers.

16.     Advertising supplied by IdeaCast is transmitted via satellite, and only on certain satellite broadcast channels.  When a live program breaks for advertising, the signal that is sent to IdeaCast's customers is substituted with IdeaCast advertising. That is, two individuals may be watching the same Cable News Network programming, but when a commercial break is taken, one person (at home) will receive local

advertising, while the second person (working out at a health club under contract with IdeaCast) will receive IdeaCast-supplied advertising.

17.     For the individual at the health club to receive IdeaCast-supplied advertising, however, the television at the health club must be displaying a channel for which IdeaCast supplies advertising (for example, CNN, NBC, ESPN, etc.), and that health club must be able to receive a satellite broadcast (as opposed to cable or some other means of signal distribution).

**B.      Preparation of Executive Summary and Financial Projections**

18.     In or around November, 2006, IdeaCast determined that it needed to raise additional capital to fund planned growth of the Company.

19.     In connection with its desire to raise additional capital, IdeaCast entered into a relationship with William Blair to seek and obtain capital by making a preferred and/or common stock offering.

20.     In or around November, 2006, William Blair, in conjunction with IdeaCast management, prepared an executive summary (the "Executive Summary") to be delivered to potential investors in IdeaCast.  A genuine and authentic photocopy of the Executive Summary is attached to this Complaint as Exhibit 1.

21.     The Executive Summary contained certain financial projections prepared by IdeaCast management and William Blair (the "Financial Projections").

22.     The Executive Summary and the Financial Projections contained financial and other projections, yet neither identified them as forward-looking statements, and neither contained nor were they accompanied by any meaningful cautionary statements identifying important and material factors that could cause actual results to differ materially from those shown in the Executive Summary and its Financial Projections.

23.     William Blair also prepared a PowerPoint presentation in conjunction with IdeaCast management (the "PowerPoint Presentation") to be delivered to potential investors in IdeaCast.  A genuine and authentic photocopy of the PowerPoint Presentation is attached to this Complaint as Exhibit 2.

24.     The PowerPoint Presentation also contained projections and forward-looking statements, yet did not identify them as such and did not contain any "bespeaks caution" admonitions or other meaningful cautionary statements identifying important and material facts that could cause actual results to differ materially from those shown in the PowerPoint Presentation.

25.     The Executive Summary, including the Financial Projections, and the PowerPoint Presentation, were both made by and with the approval of each of the individual defendants, each of whom was an executive officer of IdeaCast, and by executives and representatives of William Blair.

26.     William Blair and IdeaCast management then began delivering the Executive Summary and PowerPoint Presentation to potential investors, including unaccredited investors, around the United States, by way of general solicitations and advertising, in an effort to encourage potential investment in IdeaCast.

27.     Neither William Blair nor IdeaCast provided the LaRocques a meaningful opportunity, during a reasonable time prior to their respective purchase of the Securities, to ask questions and receive answers concerning the terms and conditions of the offering and to obtain additional information that IdeaCast possessed, or could have acquired without unreasonable effort or expense, necessary to verify the accuracy of information furnished to any investor.

28.     IdeaCast failed to file a Form D with the SEC, any other report of the transactions with state security commissions, or register the offering with any federal

or state authority.

### C.    Plaintiffs' Investment in IdeaCast

29.    On or about February 1, 2007, Smith, Doug Laux ("Laux," at that time IdeaCast's CFO), Dan Connolly ("Connolly," a William Blair employee) and Steve Tumen ("Tumen," an employee of John LaRocque's business) met with John LaRocque and Michael LaRocque at the LaRocques' office in Chicago, Illinois.

30.    At the February 1, 2007 meeting at the LaRocques' office in Chicago, Smith, Laux and Connolly represented to the LaRocques that the information contained in the PowerPoint Presentation and Executive Summary was complete, accurate and reliable.

31.    On February 1, 2007, the LaRocques viewed the PowerPoint Presentation presented by Smith, Laux and Connolly at the LaRocques' office in Chicago, Illinois. The PowerPoint Presentation set forth information about IdeaCast, including its history, its growth strategy, its business operations, the technology required for it to achieve its growth strategy, and its clients.  The PowerPoint Presentation also included a projected income statement and the assumptions on which that income statement was based, including representations of fact with regard to actual revenues of IdeaCast as of 2006, actual costs to install IdeaCast technology at new clubs, and the amount of capital that would be required by IdeaCast to achieve the financial projections set forth in the PowerPoint Presentation.  The LaRocques asked questions of Smith, Laux and Connolly at the February 1, 2007 meeting in the LaRocques' office, and those questions were answered by Smith, Laux and Connolly.  At all times, Smith, Laux and Connolly conveyed to the LaRocques that the information in the PowerPoint Presentation was complete, true and accurate in all respects.

32.    Plaintiffs relied upon the statements set forth in the PowerPoint

Presentation, as well as the oral representations of Smith, Laux and Connolly at the February 1, 2007 meeting in the Plaintiffs' office in Chicago, in choosing to invest in IdeaCast.

33.     Plaintiffs were also presented with a copy of the Executive Summary at or near in time to the February 1, 2007 meeting with Smith, Laux and Connolly.

34.     Plaintiffs relied upon the statements set forth in the Executive Summary, including the Financial Projections, in choosing to invest in IdeaCast.

35.     In or around April, 2007, the LaRocques and IdeaCast agreed that Michael LaRocque would be invited to inspect books and records of IdeaCast at the IdeaCast offices and to conduct further due diligence in connection with a potential increase in the LaRocques' investment in IdeaCast.  The parties agreed that Michael LaRocque would be given complete access to all of the books and records of IdeaCast and would be included in management communications regarding corporate strategy as though he were a member of the management team.  IdeaCast management promised Michael LaRocque "total transparency" with regard to the Company's financial condition and business operations.

36.     Despite the promise of "total transparency," Lutterbach actively concealed information from Michael LaRocque.

37.     Among other things, Michael LaRocque was excluded by Lutterbach from calls between IdeaCast management and NCM regarding NCM's potential investment in IdeaCast, discussions among IdeaCast management regarding the negotiations with NCM and ramifications of the deal structure, and various staff meetings with the office and sales staff.

38.     In or around May, 2007, Lutterbach sent an e-mail to Laux, IdeaCast's then-CFO, in which Lutterbach explicitly told Laux not to provide Michael LaRocque

with any information regarding IdeaCast.

39. In or around May, 2007, Lutterbach came into Laux's office and instructed Laux not to provide Michael LaRocque with any information regarding IdeaCast.

40. On information and belief, in or around May, 2007 Lutterbach instructed other members of IdeaCast's management not to provide Michael LaRocque with any information regarding IdeaCast.

41. Michael LaRocque did not receive complete and accurate information about IdeaCast's financial condition and business prospects while visiting the IdeaCast offices to conduct due diligence. Furthermore, Michael LaRocque was unaware of that material information concerning IdeaCast, its business, assets and prospects was being systematically and intentionally withheld from him by IdeaCast management.

42. On April 28, 2007, John LaRocque signed a document entitled "Stock Purchase Agreement dated as of April 28, 2007 by and among IdeaCast Inc. and John P. LaRocque" (the "Stock Purchase Agreement"). The Stock Purchase Agreement had attached to it an "Investor Rights Agreement," which John LaRocque also signed. A genuine and authentic copy of the Stock Purchase Agreement is attached to this Complaint as Exhibit 3.

43. The Stock Purchase Agreement purports to include IdeaCast, Inc., a Delaware corporation, as a party. In fact, no such entity existed as of the date the Stock Purchase Agreement was signed by the purported parties.

44. Section 5 of the Stock Purchase Agreement sets forth certain warranties and representations of the purported seller, IdeaCast. Among them are warranties and representations that:

> [T]he Company has been duly organized and is validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority and all necessary government approval to own, lease, and operate its properties and to carry on its business as it is now being conducted.

(Exhibit 3 at § 5A).

> The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby and thereby are within the Company's respective corporate powers and have been duly authorized by all necessary corporate action on the part of the Company.

(Exhibit 3 at § 5B).

> Since January 1, 2007 the Company has conducted its business in the ordinary course consistent with past practices, and except as set forth on Schedule 5E hereto:

> * * * * *

> (ii.) there has not been any material change in the condition (financial or otherwise) of the Company's business.

(Exhibit 3 at § 5E).

These representations, and several others set forth in the Stock Purchase Agreement, were in fact false, a fact unknown to John LaRocque as of April 28, 2007.

45. On or about April 28, 2007, John LaRocque delivered a check for $500,000 to IdeaCast to purchase 52,799 shares of IdeaCast preferred stock.

46. The Stock Purchase Agreement required the Company to issue John LaRocque certificates representing his shares within 10 days of his execution of the Stock Purchase Agreement. (Exhibit 3 at § 4A(i)).

47. The Company never issued John LaRocque any stock certificate representing the preferred shares he believed he was purchasing on April 28, 2007.

48. On or about June 22, 2007, John LaRocque exchanged his IdeaCast preferred stock for 52,799 shares of IdeaCast common stock.

49. On June 22, 2007, Michael LaRocque agreed to purchase 63,359 shares

of IdeaCast common stock from IdeaCast for a total purchase price of $600,000.

50.     None of the Defendants updated the Executive Summary, the Financial Projections or the PowerPoint Presentation as of June 22, 2007 or suggested to the Plaintiffs that any of the information contained in the Executive Summary, the Financial Projections or the PowerPoint Presentation was incomplete or inaccurate.

51.     On June 22, 2007, NCM invested approximately $5 million in IdeaCast, purchasing 527,993 shares of Preferred A stock from IdeaCast.  NCM's $5 million investment in IdeaCast was conditioned upon existing Preferred A shareholders converting their preferred shares into common shares.  NCM and IdeaCast also agreed that either could commit NCM to invest an additional $2 million before June 30, 2008 that would increase NCM's ownership of IdeaCast to approximately 25% of the capital stock of the Company on a fully-diluted basis.  In addition, NCM obtained a separate option on June 22, 2007 that permitted it to purchase up to 50.1% of the Company.

52.     On June 22, 2007, the LaRocques signed an amended investors' rights agreement  (the "First Amended Investors' Rights Agreement") with IdeaCast and NCM. That agreement amended and restated IdeaCast's original Investors' Rights Agreement, which was signed by John LaRocque on April 28, 2007 and included with the Stock Purchase Agreement as Exhibit 3 to this Complaint.  A genuine and authentic copy of the First Amended Investors' Rights Agreement is attached to this Complaint as Exhibit 4.

53.     On or about June 26, 2007, Michael LaRocque paid for his stock in IdeaCast, after NCM had completed its transaction with IdeaCast and after NCM assumed its ability to control IdeaCast.

54.     On or about October 15, 2007, IdeaCast, NCM, Smith, Lutterbach and other IdeaCast shareholders entered into a Second Amended and Restated Investors'

Rights Agreement (the "Second Amended Investors' Rights Agreement"). That agreement was intended to provide Credit Suisse Management LLC, a Delaware limited liability Company ("Credit Suisse") with certain rights regarding the opportunity to purchase stock from IdeaCast. No notice of the Second Amended Investors' Rights Agreement was provided to the LaRocques prior to this alteration. The LaRocques were not asked to sign the Second Amended Investors' Rights Agreement, which purported to amend the First Amended Investors' Rights Agreement. The LaRocques were unaware of the existence of the Second Amended Investor Rights for several months after it had been signed. A genuine and authentic copy of the Second Amended Investor Rights Agreement is attached to this Complaint as Exhibit 5.

55.     Also on October 15, 2007, IdeaCast issued a warrant to Credit Suisse, whereby Credit Suisse was granted the right to purchase 215,543 shares of common stock, and further entered into an option agreement with Credit Suisse. Despite a provision of the First Amended Investors' Rights Agreement requiring notice to IdeaCast stockholders at least 30 days prior to the issuance of "New Securities," *see* Exhibit 3 at § 5.1(a), the LaRocques were not provided with any advance notice of either the issuance of the warrant or the entry into the option agreement between IdeaCast and Credit Suisse on October 15, 2007.

### D.     Failure to Achieve Prospective Revenues

56.     Following the Plaintiffs' investment in IdeaCast, the Company failed to achieve anywhere near its projected revenues.

57.     Moreover, following the Plaintiffs' investment in IdeaCast, its expenses were materially higher than those forecasted in the Financial Projections.

58.     In late 2006 or early 2007, Smith arranged for a commercial for IdeaCast to be broadcast during Fox's coverage of the National Football League's Super Bowl

XLII on February 3, 2008 (the "Super Bowl Ad").

59.     The Super Bowl Ad and related activities resulted in committed or incurred expenditures of approximately $2.2 million.

60.     The expenditure of $2.2 million of IdeaCast funds to purchase the Super Bowl Ad was not disclosed in any of the Financial Projections.

61.     At all times relevant to the Complaint, IdeaCast paid $1,400 each month to rent an apartment in Los Angeles that served as the residence of Luke Smith, the adult son of Fred Smith (the "Los Angeles Apartment").  IdeaCast also paid approximately $235.00 per month for cable television and internet service for the Los Angeles Apartment.

62.     The expenditure of IdeaCast funds to pay the rent and utilities for an apartment in Los Angeles for Smith's adult son was not disclosed in any of the Financial Projections.

63.     At all times relevant to the Complaint, IdeaCast paid $4,900 per month to rent an apartment located at 350 West 42nd Street, Apartment 23G, New York, New York that served as the residence of Lara Smith, the adult daughter of Fred Smith (the "New York Apartment").

64.     The expenditure of IdeaCast funds to pay the rent for an apartment in New York for Smith's adult daughter was not disclosed in any of the Financial Projections.

65.     On December 1, 2007, IdeaCast entered into a one-year lease of a condominium property located at 1000 West Washington Street, Unit 215, Chicago, Illinois (the "Chicago Condo").

66.     The Chicago Condo is owned by Colleen Correra, IdeaCast's Vice President of Operations.

67.     IdeaCast pays monthly rent to Correra of $914.00 on the first of every month.  IdeaCast also paid Correra an $1,800 security deposit at the inception of the lease of the Chicago Condo.

68.     IdeaCast pays the monthly utility payments related to the Chicago Condo to People's Gas and Commonwealth Edison in the amount of approximately $100.00 each month.  Moreover, during October 2007, the Company incurred nearly $1,000 in expenses to purchase items for the Chicago Condo including a mattress, box spring and frame, and kitchen accessories.

69.     The expenditure of IdeaCast funds to rent the Chicago Condo from an IdeaCast officer, pay for certain furnishings, and pay the utilities associated with the Chicago Condo was not disclosed in any of the Financial Projections.

70.     In addition to the provision of apartments for Smith's adult children, IdeaCast provided American Express charge cards to Fred Smith and to Luke Smith and Lara Smith.

71.     Luke Smith charged approximately $12,000 per month to his IdeaCast American Express card.  IdeaCast paid these charges without reimbursement from Luke Smith or any other person.  On information and belief, a material portion of the monthly charges on Luke Smith's IdeaCast American Express charge card were not for legitimate IdeaCast business purposes.

72.     Fred Smith charged approximately $12,500 per month to his IdeaCast American Express card.  IdeaCast paid these charges without reimbursement from Fred Smith or any other person.  On information and belief, a material portion of the monthly charges on Fred Smith's IdeaCast American Express charge card were not for legitimate IdeaCast business purposes.

73.     On information and belief, Lara Smith charged significant expenses each

month to her IdeaCast American Express card. On information and belief, IdeaCast paid these charges without reimbursement from Lara Smith or any other person. On information and belief, a material portion of the monthly charges on Lara Smith's IdeaCast American Express charge card were not for legitimate IdeaCast business purposes.

74. The expenditure of IdeaCast funds to pay for personal expenses of Smith and his adult children was not disclosed in any of the Financial Projections.

75. On information and belief, throughout 2006 Smith made significant misrepresentations to third-party advertisers about IdeaCast's ability to complete installations and the number of "view impressions" that IdeaCast would be able to deliver for those advertisers.

76. On information and belief, the agreements between IdeaCast and third-party advertisers contained provisions that permitted those advertisers to terminate their agreements with IdeaCast, under certain conditions, including but not limited to if IdeaCast failed to achieve certain performance goals.

77. On information and belief, during 2006 and 2007 certain third-party advertisers terminated their agreements with IdeaCast, impacting the projected revenue shown in the Financial Projections.

78. On information and belief, certain third-party advertisers, including FTD and Molson, either terminated their agreements with IdeaCast or refused to renew those agreements on the basis that IdeaCast had misrepresented to them IdeaCast's ability to deliver a certain volume of "view impressions."

**E.   Defendants' False and Misleading Statements and Omissions**

79. As of April 28, 2007, when John LaRocque tendered a check for $500,000 to buy what he thought were 52,799 shares of IdeaCast preferred stock;

IdeaCast did not exist.  IdeaCast was formed on May 7, 2007 when its Articles of Incorporation (which were signed by the incorporator on April 30, 2007) were filed with the Delaware Secretary of State.

80.     Smith, Connolly and IdeaCast represented to the LaRocques at the February 1, 2007 meeting in the LaRocques' office in Chicago that IdeaCast existed, and that they were being offered securities of an existing company.

81.     The Executive Summary represented that IdeaCast "was incorporated in Illinois as a C Corp in September, 2004. . . ."  (Exhibit 1 at 16).

82.     The PowerPoint Presentation, in the section entitled "Company Overview," stated that IdeaCast was "Founded in 2004 in Chicago, IL."  (Exhibit 2 at 2).

83.     On April 25, 2007, Diane Bell, an attorney from Katten Muchin Rosenman, LLP  ("Katten"), IdeaCast's outside counsel, sent an e-mail to Michael LaRocque related to John LaRocque's proposed purchase of IdeaCast stock.  Matthew Brown, another attorney at Katten, was copied on that e-mail.  By forwarding those documents to Michael LaRocque to give to John LaRocque to sign, IdeaCast's attorneys were representing to John LaRocque and Michael LaRocque that IdeaCast existed and that John LaRocque would be purchasing 52,799 shares of duly authorized shares of preferred stock in IdeaCast.

84.     Smith and IdeaCast represented to John LaRocque on or about, but not later than April 24, 2007 that IdeaCast existed.

85.     On or about April 28, 2007, Smith and IdeaCast represented to John LaRocque that he was purchasing 52,799 shares of preferred stock in the existing company, IdeaCast.

86.     As of April 28, 2007 no board of directors of IdeaCast existed, no

issuance of shares to John LaRocque had been approved or authorized, and the transaction in which John LaRocque believed he had purchased his shares of IdeaCast had not been approved or authorized by a board of directors, as no such board existed at the time. Furthermore, no certificate of designation for the stock sold to John LaRocque on April 28, 2007 had been filed with the Delaware Secretary of State as of that date.

87. John LaRocque relied upon the misrepresentations of Smith, Connolly and IdeaCast regarding the existence of IdeaCast as of February 1, 2007 and April 28, 2007. John LaRocque was unaware that in truth the Company did not yet exist, that no board of directors of IdeaCast existed, that no issuance of shares to him had been approved or authorized, or that the transaction by which he believed he was purchasing preferred stock of IdeaCast had not been authorized or approved by the board of directors of the Company.

88. Had John LaRocque been aware as of April 28, 2007 that IdeaCast had not yet been formed, or that that no board of directors existed, or that the issuance of shares to him had not been approved or authorized, or that the transaction by which he believed he was purchasing those preferred shares had not been authorized or approved by the board of directors of the Company, he would not have invested in IdeaCast.

89. Had Michael LaRocque been aware as of June 22, 2007 that IdeaCast, its management and William Blair made misrepresentations to John LaRocque in connection with John LaRocque's investment in IdeaCast on April 28, 2007, Michael LaRocque would not have invested in IdeaCast on June 22, 2007.

90. In the context of the material representations and statements made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial

Projections, Defendants omitted and intentionally did not provide the Plaintiffs with any written description of the material "risk factors" associated with the stated anticipated achievement of the IdeaCast business model or Financial Projections, nor did any of the Defendants orally describe any of the risks Plaintiffs faced by investing in IdeaCast. For example, in the PowerPoint Presentation, Defendants stated with respect to the proprietary technology of IdeaCast: "No technology risk."

91. In the context of the material representations and statements made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, Defendants did not disclose to the Plaintiffs any risks associated with the possible delay in receiving the forecast revenue shown in the Financial Projections.

92. In the context of the material representations and statements made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, Defendants did not disclose to the Plaintiffs any risks that the amount of revenue shown in the Financial Projections might not actually be realized.

93. In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, Defendants did not disclose to the Plaintiffs any risks associated with possible expenditures that might exceed the expenditures forecast in the Financial Projections.

94. In fact, risks of delay in receipt of forecasted revenue, reduced amount of revenue, and increased expenditures were actually occurring as of the time the Defendants offered and sold IdeaCast common stock to the Plaintiffs.

95. In order to deliver IdeaCast advertising to the health clubs that IdeaCast had entered into contracts with, IdeaCast needed to be able to deliver a satellite signal to those clubs. IdeaCast's Executive Summary explains:

> IdeaCast's third-party uplink facility is located in Los Angeles and is run
> by Access IT. Content from the Company's partner networks is beamed

> down to this facility. IdeaCast then "swaps out" the existing advertising
> with targeted advertising and beams the signal back to the Company's
> satellite. This content is then transferred to the health clubs via a
> receive-only antenna system and non-penetrating roof mount provided
> by Andrew Corporation. The IdeaCast networks are transmitted via a
> private satellite distribution system.

(Exhibit 1 at 17).

96.     IdeaCast represented to Plaintiffs that the existing technology was

capable of delivering IdeaCast advertising into the clubs with which it had contracted.

(Exhibit 1 at 14).

97.     What IdeaCast's management knew, but failed to disclose to Plaintiffs,

was that for many – perhaps most – of the New York health clubs it had contracted

with, it was unable to deliver a satellite signal. Those clubs are mainly located in high

rise buildings where IdeaCast was unable to mount its "receive-only antenna system[s]

and non-penetrating roof mount[s]."

98.     IdeaCast management touted the fact that the cost to install its system

in health clubs was very low. IdeaCast's Executive Summary stated that "Because the

costs of securing content, uplink services and satellite availability are relatively fixed .

. . ." IdeaCast was able to predict profits reliably. (Exhibit 1 at 21-22).

99.     IdeaCast stated that installations of its equipment at the health clubs

would cost "approximately $3,000 per club in addition to the cost of each Motorola

unit of approximately $1,250." (Exhibit 1 at 22). In preparing the Financial

Projections, IdeaCast "capitalized and amortized over five years" those costs. (Exhibit

1 at 22). The PowerPoint Presentation referred to "total installation costs per club" of

$4,875 as a "Key Driver" or assumption on which the Financial Projections were

based. (Exhibit 2 at 25, 27).

100.    In fact, because IdeaCast was unable to deliver a satellite signal to many

of the health clubs it had contracted with, its estimate of the costs that would be

incurred for these installations were seriously understated.

101.    The cost to develop and install systems capable of delivering IdeaCast advertising to the clubs IdeaCast had entered into contracts with was significantly higher than the cost IdeaCast represented in its Executive Summary and used as the basis for its Financial Projections.

102.    In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, IdeaCast knew but failed to disclose to Plaintiffs that it was unable to deliver a satellite signal to many health clubs.

103.    In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, IdeaCast knew but failed to disclose to Plaintiffs the true cost of finding an alternative method of delivering its advertising to those clubs.

104.    In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, IdeaCast knew but failed to disclose to Plaintiffs the need to design an alternative method of delivering its advertising to those clubs.

105.    In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, IdeaCast knew but failed to disclose to Plaintiffs that the need to design an alternative method of delivering advertising to those clubs would result in a significant delay in the receipt of the forecast revenue in the Financial Projections.

106.    In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, IdeaCast knew but failed to disclose to Plaintiffs that the need to design an alternative

method of delivering advertising to those clubs would result in significantly increased expenses over those expenses shown in the Financial Projections.

107.    In the context of the material representations made by Defendants in the Executive Summary, the PowerPoint Presentation and the Financial Projections, IdeaCast knew but failed to even disclose to the Plaintiffs the risks associated with the possibility that health clubs might be located in high rise buildings that would be unable to accommodate the roof mounted satellite receiving antenna that was required for IdeaCast to deliver its advertising content at the cost and in the quantity that was described in the Executive Summary.

108.    In fact, IdeaCast affirmatively represented in the PowerPoint Presentation that its Financial Projections entailed "No technology risk." (Exhibit 2 at 23).

109.    Prior to their investment in IdeaCast, IdeaCast told each of the Plaintiffs that one of the benefits of IdeaCast's advertising was that the clubs in which IdeaCast would be delivering advertising had the channels on their televisions "locked" onto channels on which IdeaCast was supplying advertising so that customers could not change them.  This would have the effect of increasing the number of impressions delivered and thus the amount of revenue IdeaCast would generate.

110.    This representation was echoed in the Executive Summary, which stated that "IdeaCast advertising is highly targeted to a captive audience *that cannot turn the ad off. . . .* " (Exhibit 1 at 2)(Emphasis added).  The Executive Summary further stated "Network health clubs are contractually obligated to display IdeaCast programming at all times." (Exhibit 1 at 2-3).  The Executive Summary also stated:  "The partnerships [with health clubs] also consist of an agreement that locks in the content viewed on the televisions, ensuring that both programming and sponsor messages are showing without channel changing. . . ." (Exhibit 1 at 14).

111.    The Financial Projections in the Executive Summary were based on a forecasting model that included an assumption that the television sets at each club would be "locked" and that customers of those clubs would be forced to receive IdeaCast advertising.  The Executive Summary touted IdeaCast's ability to track viewership that was in turn used to generate revenue projections:  "IdeaCast's exclusive agreements with its larger member health clubs require them to supply proprietary detailed demographic information, and all clubs provide actual attendance on a monthly basis."  (Exhibit 1 at 8).  This, according to IdeaCast's Executive Summary, meant that its "viewership is highly predictable."  (Exhibit 1 at 15).  Using that information, IdeaCast falsely stated in the Executive Summary that they were currently "serving over a billion annual viewers."  (Exhibit 1 at 11).  A similar reference to "one billion annual impressions" was repeated in the PowerPoint Presentation. (Exhibit 2 at 13).

112.    In fact, IdeaCast knew that few, if any, clubs "locked" their televisions onto channels broadcasting IdeaCast advertising.  On information and belief, at most clubs patrons were entitled to request that the channels be changed, and in so doing were able to avoid viewing IdeaCast-supplied advertising and thus negatively impact IdeaCast revenue.

113.    IdeaCast's revenue projections were based on the assumption that the factual statements in the Executive Summary regarding the ability of health clubs to turn ads off or change channels were true.

114.    In fact, IdeaCast knew those statements were untrue, and the financial projections in turn were inaccurate and overinflated.

115.    IdeaCast knew but never disclosed to the Plaintiffs that in fact health club customer would have the ability to change channels on health club television sets

and thereby decrease the number of "view impressions" and in turn reduce the amount of revenue forecast in IdeaCast's Financial Projections.

116.    IdeaCast never even disclosed to the Plaintiffs the risk that health clubs might not "lock" channels in such a way that their customers would be unable to change the channel to one that did not broadcast IdeaCast supplied advertising, thereby reducing the amount of revenue forecast in IdeaCast's Financial Projections.

117.    On information and belief, Smith knowingly and intentionally concealed from Plaintiffs the fact that he had made certain untrue representations to advertisers about IdeaCast's ability to deliver a certain number of "view impressions" and meet certain performance goals, and further concealed from Plaintiffs the fact that these advertisers were able to terminate their relationship with IdeaCast if IdeaCast failed to meet these goals.

118.    On information and belief, the Financial Projections were based on the unrealistic assumption that no advertisers would cancel their agreements with IdeaCast, and that IdeaCast would meet the performance goals set forth in the agreements with those advertisers.

119.    On information and belief, throughout 2006 and early 2007 IdeaCast either failed to meet the performance goals set forth in agreements with advertisers or advertisers determined that IdeaCast had misrepresented its ability to deliver a certain volume of "view impressions," and advertisers terminated or failed to renew their relationships with IdeaCast as a result.

120.    The Executive Summary falsely stated that "$10 million is sufficient to fully fund the business in the long term and [IdeaCast] does not intend to seek future equity financing." (Exhibit 1 at 3).  The Executive Summary also states, just above the Financial Projections:  "With an investment of $10 million in 2006, Management

believes the Company will effectively and efficiently be able to roll-out its product as shown below." (Exihbit 1 at 21). IdeaCast knew this to be untrue.

121. The PowerPoint Presentation echoed this sentiment, stating: "Minimal capital [is] required to completely fund [the] plan" (Exhibit 2 at 23) and "$10 million [is] sufficient to fully fund business in [the] long-term." (Exhibit 2 at 28). IdeaCast knew this to be untrue.

122. Given the rate at which IdeaCast was spending money as of February 1, 2007, April 28, 2007 and June 22, 2007, IdeaCast and NCM knew that there was no way that $10 million would be sufficient capital to fund the business operations as described in the Executive Summary and result in the earnings predicted in the Financial Projections.

123. In fact, IdeaCast and NCM both knew that IdeaCast was unable to run ads in some clubs because it lacked sufficient capital to pay those clubs the fees required for its advertising to be displayed pursuant to its contract.

124. On February 1, 2007 at the LaRocques' office, Smith told the LaRocques that there were 12 advertising agencies that participated in the Arbitron study IdeaCast had utilized in projecting future revenue. Smith told the LaRocques that these chains were generating revenue as of February 1, 2007.

125. On information and belief, the health club chains referred to by Smith on February 1, 2007 were not actually generating revenue as of that date.

126. On or about February 1, 2007 at the LaRocques' office, Smith told Michael LaRocque that IdeaCast had entered into a lucrative long-term contract with NBC.

127. On information and belief, the Financial Projections were based in part upon an assumption that the NBC Contract would be honored and that IdeaCast

would meet all of its obligations under that agreement, including but not limited to a representation that IdeaCast would be providing advertising in at least 5,000 health clubs prior to the end of 2006.

128.   The NBC Contract required IdeaCast to be providing advertising in at least 5,000 health clubs prior to the end of 2006.  Failure to achieve that goal would allow NBC to terminate the contract.

129.   No one from IdeaCast ever disclosed to any of the Plaintiffs the risk that NBC might have contractual grounds to terminate its contract, or that the Financial Projections assumed that the NBC Contract would continue and would produce revenues.

130.   IdeaCast was not providing advertising in 5,000 or more health clubs prior to the end of 2006.  The Executive Summary indicates that IdeaCast had only 300 clubs under contract as of year end 2006.  (Exhibit 1 at 13).  And one of NCM's public filings indicates that IdeaCast had only 1,000 clubs under contract as of December 21, 2007.

131.   The PowerPoint Presentation indicated that by year-end 2007 there would be 1,456 health clubs under contract with IdeaCast.

132.   The Executive Summary represents that "The Company currently has a backlog of 240 clubs to install . . ." and will "expand[] beyond 1,500 clubs in 2007 . . . ." (Exhibit 1 at 12).  Yet, by year end 2006 IdeaCast had only 300 clubs under contract (Exhibit 1 at 13).  Therefore, to achieve its predicted 1500 clubs by year end 2007 (a difference of 1200 clubs), IdeaCast would have had to have been installing 100 new clubs each month during 2007.  The Company had never installed new clubs at that pace, and there was no reasonable basis on which to estimate that it would be able to do so in 2007, a fact intentionally concealed from Plaintiffs.

133.   By June 22, 2007, the pace of installations into health clubs had slowed such that Defendants knew as of that date that IdeaCast would not have 1,456 health clubs signed up by year end.  Defendants knew as of June 22, 2007 that they would likely have only approximately 1,000 health clubs under contract by year end 2007. Defendants intentionally concealed this information from Plaintiffs.

134.   In addition, although the PowerPoint Presentation represented that there would be at least 80 new installations each month, in reality the Company had never achieved that objective on a consistent basis, a fact intentionally concealed from Plaintiffs.  (Exhibit 2 at 26)

135.   IdeaCast knew in February, 2007, April, 2007 and June, 2007 that it was unable to install new clubs at a pace of 100 clubs per month, but intentionally concealed that fact from Plaintiffs.

136.   The Executive Summary also states that "the Company  is currently in final negotiations with a few large health club groups that are expected to close shortly." (Exhibit 1 at 12).  Those transactions never closed.  Plaintiffs were never provided with any disclosures regarding the possibility that those transactions might not close, or what impact the failure to close those transactions as represented would have on the Financial Projections, which were based on an assumption that those transactions would close.

137.   The PowerPoint Presentation falsely represented that the "Unit Economics" was the generation of "over $20,000 in revenue per year" per health club. (Exhibit 2 at 27).  There was not rational basis for this representation of fact.  The fact that those economics were not readily achievable was known to the Defendants, but intentionally concealed from the Plaintiffs prior to the time they invested in their shares.

138.   On April 24, 2007, Fred Smith sent Michael LaRocque an email asking if Michael LaRocque could contact an advertising person on his behalf. In Fred's email he said Ideacast's "significant milestone would be the completion of the Arbitron study currently in process, which we expect to validate our model, not only for the 12 major brands participating, American Airlines, AT & T, Wishbone, Slim Fast, Caress, Quaker's Mini-Delights, Quaker's Oat Meal, Propel, Career Builder, Dunkin Donuts, Jennie-O, Mercury and Saab." Sometime shortly after April 24, 2007 Michael LaRocque and Fred Smith spoke about the email, and Michael LaRocque understood that these were revenue generating advertisers as of that time. On information and belief, these companies were not actually paying customers as Smith indicated.

139.   At no time did IdeaCast explain any "risk factors" to Plaintiffs or provide any additional information – either orally or in writing - concerning factors that could cause actual results to differ materially from those described for the Plaintiffs orally and in the Executive Summary and PowerPoint Presentation.

140.   At the time they purchased their stock in IdeaCast, Plaintiffs were unaware of the risks described above that were experienced by IdeaCast with regard to the possibility of revenue significantly lower than that forecast in the Financial Projections or expenses significantly higher than that forecast in the Financial Projections.

### Loss Causation/Economic Loss

141.   By misrepresenting to John LaRocque that IdeaCast was a company that had been formed, that it had a board of directors, and that the issuance of shares to John LaRocque had been approved, IdeaCast, Smith and William Blair made intentional misstatements of fact that caused John LaRocque to give $500,000 to IdeaCast that he would not have given the Company had he known the truth.

142.    By misrepresenting its Financial Projections and financial outlook, IdeaCast and the other Defendants presented a misleading picture of IdeaCast's business and prospects to the LaRocques.  Thus, instead of truthfully disclosing that IdeaCast was not as healthy as presented, Defendants misrepresented IdeaCast's financial outlook and its actual business prospects going forward.

143.    IdeaCast and the other Defendants also made intentional misstatements of material fact that existed as of the date of the Plaintiffs' investments in IdeaCast.

144.    IdeaCast and the other Defendants intentionally withheld material information from the Plaintiffs as of the date of their investments in IdeaCast.

145.    Defendants' false and misleading statements and intentional omission of material information had the intended effect and caused the Plaintiffs to invest substantial sums of money in IdeaCast.

146.    The truth about IdeaCast's business operations, finances, business metrics, and future business and financial prospects was not discovered by the Plaintiffs until some time after February 1, 2008.

147.    As a direct result of Defendants' misrepresentations and intentional omissions of material information, the value of IdeaCast fell significantly, causing real economic loss to investors including the Plaintiffs.

### COUNT 1

### For Violations of Section 10(b) of the 1934 Act and Rule 10b-5
### (By John LaRocque Against IdeaCast, Smith, Lutterbach & William Blair)

148.    John LaRocque hereby incorporates the allegations of paragraphs 1-147 of this Complaint by reference as if set forth in full.

149.    In connection with the sale of IdeaCast securities, and by use of the mails or other devices or instrumentalities of interstate commerce, IdeaCast, Smith, Lutterbach and William Blair disseminated or approved the false statements specified

above, which contained misrepresentations as to material facts as well as omissions as to same, despite a duty to disclose.

150. IdeaCast, Smith, Lutterbach and William Blair made such statements knowingly, or with reckless regard to the truth, without good faith, and with the intent to deceive or defraud John LaRocque into purchasing IdeaCast stock.

151. John LaRocque would not have purchased IdeaCast stock if he had been aware of the true facts that were misrepresented or omitted by IdeaCast, Smith, Lutterbach and William Blair about IdeaCast.

152. John LaRocque has suffered damages as a result of the aforementioned misrepresentations and omissions as he paid an artificially inflated price for IdeaCast stock.

153. Further, as a direct result of IdeaCast's, Smith's, Lutterbach's, and William Blair's misrepresentations and intentional omissions of material information, the value of IdeaCast fell significantly, causing real economic loss to investors such as John LaRocque.

154. Thus IdeaCast, Smith, Lutterbach and William Blair violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon John LaRocque in connection with his purchase of IdeaCast stock.

WHEREFORE, Plaintiff John LaRocque hereby requests entry of judgment in his favor and against each of IdeaCast, Smith, Lutterbach, and William Blair, jointly and severally, in the amount of not less than $500,000.00 plus prejudgment interest

and costs, and for such other and further relief as the Court may deem just and necessary.

## COUNT 2

### For Violations of Section 10(b) of the 1934 Act and Rule 10b-5 (By Michael LaRocque Against All Defendants)

155.    Michael LaRocque hereby incorporates the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

156.    In connection with the sale of IdeaCast securities, and by use of the mails or other devices or instrumentalities of interstate commerce, Defendants disseminated or approved the false statements specified above, which contained misrepresentations as to material facts as well as omissions as to same, despite a duty to disclose.

157.    Defendants made such statements knowingly, or with reckless regard to the truth, without good faith, and with the intent to deceive or defraud Michael LaRocque into purchasing IdeaCast stock.

158.    Michael LaRocque would not have purchased IdeaCast stock if he had been aware of the true facts that were misrepresented or omitted by Defendants about IdeaCast.

159.    Michael LaRocque has suffered damages as a result of the aforementioned misrepresentations and omissions as he paid an artificially inflated price for IdeaCast stock.

160.    Further, as a direct result of Defendants' misrepresentations and intentional omissions of material information, the value of IdeaCast fell significantly, causing real economic loss to investors such as Michael LaRocque.

161.    Thus, Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue

statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Michael LaRocque in connection with his purchase of IdeaCast stock.

WHEREFORE, Plaintiff Michael LaRocque hereby requests entry of judgment in his favor and against each of the Defendants, jointly and severally, in the amount of not less than $600,000.00 plus prejudgment interest and costs, and for such other and further relief as the Court may deem just and necessary.

## COUNT 3

### For Violations of Section 12(a)(2) of the 1933 Act
### (Against All Defendants)

162.    Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

163.    Defendants sold the Plaintiffs common stock in IdeaCast.  Each of the Defendants was a "seller" of IdeaCast stock as defined by Section 12 of the 1933 Act. In selling IdeaCast stock to the Plaintiffs, each of the Defendants was motivated by a desire to serve its own financial interests.

164.    Defendants made the offer and sale of IdeaCast common stock by the use of interstate commerce and/or the mails.

165.    Defendants utilized a written Executive Summary and oral communications to make the offer and sale of IdeaCast common stock.

166.    Defendants offered IdeaCast common stock for sale to the public.

167.    The written Executive Summary used by Defendants in connection with the offering of IdeaCast common stock to the public contained untrue statements of material fact and omitted to state material facts as described above.

168. Plaintiffs did not know of the untruths and omissions at the time the IdeaCast common stock was offered to them.

WHEREFORE, pursuant to Section 12(a)(2) of the 1933 Act, Plaintiffs are entitled to and hereby rescind such purchases and sales, demand entry of a judgment declaring such purchases and sales to be rescinded, together with the full recovery of the consideration paid by each of them therefor, and hereby tender such Securities to IdeaCast. Plaintiffs also seek reasonable attorneys' fees, costs and such additional and further relief as the Court may deem just and necessary.

## COUNT 4

### (In the Alternative to Count 3)

### For Violations of Section 12(a)(1) of the 1933 Act
### (Against IdeaCast, Smith, Lutterbach & William Blair)

169. Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

170. In the alternative to the allegations of Count 3 above, IdeaCast, Smith, Lutterbach and William Blair privately offered to sell common stock of IdeaCast to Plaintiffs. Each of IdeaCast, Smith, Lutterbach and William Blair was a "seller" of IdeaCast stock as defined by section 12 of the 1933 Act. In selling IdeaCast stock to the Plaintiffs, each of IdeaCast, Smith, Lutterbach and William Blair was motivated by a desire to serve its own financial interests.

171. Defendant IdeaCast, directly and indirectly through Defendant William Blair, offered and sold the Securities to the Plaintiffs, who were not accredited investors as that term is defined under Rule 501 of Regulation D ("Regulation D"} promulgated by the Securities Exchange Commission (the "SEC") pursuant to the 1933 Act, and in connection therewith did not provide the Plaintiffs within a reasonable time prior to the sale of the Securities the information required to be

provided under Rule 502(b)(2) of Regulation D.

172.    Defendant IdeaCast, directly and indirectly through Defendant William Blair, conducted a public solicitation in connection with the offer and sale of the Securities (the "Offering").

173.    Neither IdeaCast, Smith, Lutterbach nor William Blair furnished to any Plaintiff who was not an accredited investor a brief description in writing of any material written information concerning the Offering that has been provided by Defendant IdeaCast to any accredited investor but not previously delivered to such unaccredited purchaser.

174.    IdeaCast, Smith, Lutterbach and William Blair did not make available to Plaintiffs, at a reasonable time prior to their respective purchase of the Securities, a meaningful opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain additional information that Defendant IdeaCast possesses or could acquire without unreasonable effort or expense that is necessary to verify the accuracy of information furnished to any investor or purchaser under the provisions of Regulation D.

175.    Defendant IdeaCast did not file a Form D with the SEC as required under Rule 503(a) of Regulation D, then in effect.

176.    Accordingly, the Offering did not comply with the so-called "safe-harbor" provisions of Regulation D or the private offering exemption under Section 4(2) of the 1933 Act, and, as a result, the Offering was subject to the registration requirements of Section 5 of the 1933 Act.

177.    Defendant IdeaCast did not comply with the registration requirements of Section 5 of the Securities Act in connection with the Offering.  No registration statement was filed by the Company in connection with the Offering with the SEC.

178.   Defendant William Blair violated the provisions Section 5 of the 1933 Act. Defendants did not comply with the registration requirements of the Section 5 of the 1933 Act in connection with the Offering.

179.   Defendants utilized the mails and facilities of interstate commerce in connection with the offer and sale of IdeaCast common stock to Plaintiffs.

WHEREFORE, pursuant to Section 12(a)(1) of the 1933 Act, Plaintiffs are entitled to and hereby rescind such purchases and sales, demand entry of a judgment declaring such purchases and sales to be rescinded, together with the full recovery of the consideration paid by each of them therefor, and hereby tender such Securities to IdeaCast. Plaintiffs also seek reasonable attorneys' fees, costs and such additional and further relief as the Court may deem just and necessary.

## COUNT 5

### For Violations of Section 20 of the 1934 Act
### (Against NCM, Smith, and Lutterbach)

180.   Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

181.   By reason of their positions with IdeaCast, which involved influence over IdeaCast's day-to-day operation, and by reason of their ownership of IdeaCast stock, NCM, Smith and Lutterbach had the power and authority to direct the management and policies of IdeaCast.

182.   Accordingly, NCM, Smith and Lutterbach acted as controlling persons of IdeaCast within the meaning of Section 20(a) of the 1934 Act.

183.   As detailed above, IdeaCast violated Section 10(b) of the 1934 Act, Rule 10b-5 promulgated thereunder, and either Section 12(a)(1) or 12(a)(2) of the 1933 Act.

184.   By reason of such conduct, NCM, Smith and Lutterbach are liable pursuant to section 20(a) of the 1934 Act.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against NCM, Smith, and Lutterbach, jointly and severally, in the amount of not less than $1,100,000.00 together with the costs of this action, and such other and further relief as the Court deems just and necessary.

## COUNT 6

### For Violations of Sections 12(F), 12 (G), and 12(I) of the Illinois Securities Law of 1953 (815 ILCS 505/12 *et seq.*).
### (Against All Defendants)

185.   Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

186.   As detailed above, Defendants engaged in a sale of securities that worked a fraud or deceit upon the Plaintiffs as purchasers thereof.

187.   Defendants did so by means of untrue statements of  material facts and omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

188.   Defendants did so in order to obtain Plaintiff's monetary investment in IdeaCast.

189.   Additionally, these acts constitute a scheme to defraud in connection with the sale or purchase of IdeaCast securities.

190.   By reason of such conduct, Defendants are liable pursuant to Sections 12(F), 12 (G), and 12(I) of the Illinois Securities Law of 1953.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against Defendants, jointly and severally, in the amount of not less than $1,100,000.00 together with reasonable attorneys' fees, the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 7

### For Violations of Section 12(H) of the Illinois Securities Law of 1953 (815 ILCS 505/12 *et seq.*).
### (Against All Defendants)

191.   Plaintiffs hereby incorporate the allegations of paragraphs 1 – 147 of this Complaint by reference as if set forth in full.

192.   Defendants signed and circulated a Executive Summary pertaining to IdeaCast securities despite knowing or having reasonable grounds to know that material representations therein contained were false or untrue.

193.   By reason of such conduct, Defendants are liable pursuant to Section 12(H) of the Illinois Securities Law of 1953.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against Defendants, jointly and severally, in the amount of not less than $1,100,000.00 together with reasonable attorneys' fees, the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 8

### For Violations of Section 12(J) of the Illinois Securities Law of 1953 (815 ILCS 505/12 *et seq.*).
### (Against William Blair)

194.   Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

195.   William Blair acted as an investment adviser to IdeaCast in its 2007 issuance of common stock.

196.   In the course of doing so, William Blair engaged in acts, practices, and a course of business that was fraudulent and deceptive.

197.   By reason of such conduct, William Blair is liable pursuant to Section 12(J) of the Illinois Securities Law of 1953.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against William Blair in the amount of not less than $1,100,000.00 together with attorneys' fees, the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 9

### For Violations of the Illinois Consumer Fraud
### and Deceptive Business Practices Act
### (Against All Defendants)

198.    Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

199.    As detailed above, Defendants engaged in a deceptive act or practice, by virtue of knowingly or recklessly made false statements of material fact, with the intention of inducing Plaintiffs to rely on such statements and purchase IdeaCast stock.

200.    This deception occurred in the course of conduct involving trade or commerce.

201.    As a direct result of Defendants' false statements, the value of IdeaCast fell significantly, causing real economic loss to investors including the Plaintiffs.

202.    By reason of such conduct, Defendants are liable pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against Defendants, jointly and severally, in the amount of not less than $1,100,000.00 together with reasonable attorneys' fees, the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 10

### For Common Law Fraud
### (Against All Defendants)

203.   Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

204.   As detailed above, Defendants knowingly or recklessly made false statements of material fact, on which Plaintiffs reasonably relied, with the intention of inducing Plaintiffs to purchase IdeaCast stock.

205.   As a direct result of Defendants' false statements, the value of IdeaCast fell significantly, causing real economic loss to investors such as the Plaintiffs.

206.   By reason of such conduct, Defendants are liable for common law fraud.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against Defendants, jointly and severally, in the amount of not less than $1,100,000.00 together with the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 11

### For Common Law Conspiracy

### (Against All Defendants)

207.   Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

208.   As detailed above, Defendants knowingly and intentionally participated in a common scheme to commit an unlawful act, or lawful acts in an unlawful manner.

209.   Defendants agreed to commit tortious acts including but not limited to fraud as alleged herein in furtherance of their scheme.

210.   As a direct result of Defendants' participating in this common scheme,

they caused real economic loss to the Plaintiffs.

211.    By reason of their participation in such a scheme, Defendants are liable for common law conspiracy jointly and severally.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against Defendants, jointly and severally, in the amount of not less than $1,100,000.00 together with the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 12

### For Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (Against All Defendants)

212.    Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

213.    IdeaCast is an enterprise engaged in and the activities of which affect interstate commerce, to wit: a corporation incorporated under the laws of the State of Delaware.

214.    Defendants, NCM, Frederick Smith, and Richard Stephen Lutterbach, as persons within the meaning of 18 U.S.C. § 1961(3), and as persons employed by or in control of said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

215.    The numerous predicate acts which constitute this pattern of racketeering activity are set out in the following paragraphs of this Complaint: Paragraphs 2, 22, 24, 43, 79 – 140. (*See Also* 148 – 161, 180 – 206).

216.    These acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

217. Plaintiffs were injured in their business or property by reason of this violation of 18 U.S.C. § 1962, in that, as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, in reliance of the integrity of the market, they paid artificially inflated prices for IdeaCast stock.

218. By reason of the Defendants' violation of 18 U.S.C. § 1962, Plaintiffs are entitled, pursuant to 18 U.S.C. § 1964(c), to threefold the damages sustained or $3,300,000.00, with prejudgment interest and a reasonable attorney's fees and costs.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against Defendants, jointly and severally, in the amount of not less than $3,300,000.00 together with reasonable attorneys' fees, the costs of this action, and such other and further relief as the Court may deem just and necessary.

## COUNT 13

### For Breach of Contract
### (By John LaRocque against IdeaCast)

219. John LaRocque hereby incorporates the allegations of paragraphs 1 - 147 of this Complaint by reference as if set forth in full.

220. John LaRocque and IdeaCast entered into the Stock Purchase Agreement on April 28, 2007. (Exhibit 3).

221. Section 2 of the Stock Purchase Agreement set forth certain conditions with respect to John LaRocque's purchase of stock pursuant to the agreement. Among there were that the warranties and representations of IdeaCast set forth in the Stock Purchase Agreement were "true and correct" (Exhibit 3 at ¶ 2B) and that all necessary qualifications to issue the Series A Preferred Stock that was the subject of the Stock Purchase Agreement would be obtained (Exhibit 3 at ¶ 2C) as well as the authorization of and reservation by the Company of a sufficient number of common shares so as to permit the potential conversion of the Series A Preferred Stock to

common stock (Exhibit 3 at ¶ 2F).

222.    These conditions were not satisfied as of April 28, 2007.

223.    Section 4 of the Stock Purchase Agreement imposed certain obligations on IdeaCast with respect to the sale of preferred shares to John LaRocque.  Included among these was the obligation to deliver to John LaRocque within 10 days business days, "one or more stock certificates evidencing the shares of Series A Preferred Stock purchased. . . ."  (Exhibit 3 at ¶ 4A(i)).

224.    The Company breached its obligation to deliver to John LaRocque stock certificates evidencing the shares of preferred stock he believed he was purchasing.

225.    Section 4B of the Stock Purchase Agreement provides that the Company would make "all federal and state securities law filings required in connection with the sale of the Series A preferred stock. . . ."  (Exhibit 3 at ¶ 4B).

226.    The Company breached its obligation to make all necessary federal and state securities law filings required in connection with the sale of the Series A preferred stock.

227.    Section 4C of the Stock Purchase Agreement provides that the Company would "use the net proceeds from the sale of the shares of Series A Preferred Stock hereunder for general working capital."  (Exhibit 3 at ¶ 4C).

228.    The Company breached its obligation to use the net proceeds from John LaRocque's investment in IdeaCast to be used for general working capital, and instead permitted Fred Smith to use those proceeds for personal expenses such as those associated with condominiums for his adult children and personal charges on his American Express card.

229.    Section 5 of the Stock Purchase Agreement set forth a number of warranties and representations of the Company as detailed in paragraph 44 of this

Complaint.

230.   IdeaCast breached its warranties and representations set forth in Section 5 of the Stock Purchase Agreement as detailed in paragraph 44 of this Complaint. Among other things, the Company had *not* been duly organized as represented in Section 5A, and did not have the corporate power, authority and approval necessary to enter into the transaction contemplated by the Stock Purchase Agreement, the transaction had not been "duly authorized by all necessary corporate action on the part of the Company" as represented in Section 5B, the Company had not been conducting business in the ordinary course "[s]ince January 1, 2007" as represented in Section 5E.  Moreover, there had been material adverse changes in the financial information provided to John LaRocque as of April 28, 2007, contrary to the representation in Section 5E.

231.   IdeaCast's breach of its warranties and representations caused John LaRocque damage.

WHEREFORE, John LaRocque seeks entry of judgment in his favor and against IdeaCast declaring his purchase of stock pursuant to the Stock Purchase Agreement to be void and rescinded, and directing IdeaCast to return to John LaRocque not less than $500,000.00 together with prejudgment interest and the costs of this action; alternatively, John LaRocque seeks entry of judgment in his favor and against IdeaCast in the amount of not less than $500,000.00 together with prejudgment interest and the costs of this action, and such other and further relief as the Court may deem just and necessary.

### COUNT 14

### For Breach of Contract
### (Against IdeaCast)

232.   Plaintiffs hereby incorporate the allegations of paragraphs 1 - 147 of this

Complaint by reference as if set forth in full.

233.    Plaintiffs John and Michael LaRocque, as investors in IdeaCast as of April 28, 2007 and June 22, 2007 respectively, were parties to IdeaCast's First Amended Investors' Rights Agreement.  (Exhibit 4).

234.    On October 15, 2007, IdeaCast issued a warrant to Credit Suisse whereby Credit Suisse was granted the right to purchase 215,543 shares of common stock.  On that same date, IdeaCast also entered into an option agreement with Credit Suisse.

235.    Section 5.1(a) of the First Amended Investors' Rights Agreement requires notice to IdeaCast stockholders at least 30 days prior to the issuance of "New Securities."  Specifically, that provision states:

> If the Company undertakes or proposed to undertake an issuance or issuances of New Securities, it shall give each stockholder written notice ("Preemptive Notice") describing the New Securities and the price and terms upon which the Company proposes to issue the same.  The Company shall give a Preemptive Notice at least 30 days prior to an issuance of New Securities.

(Exhibit 4 at § 5.1(a)).

236.    Nonetheless the LaRocques were not provided with any advance notice of either the issuance of the warrant or the entry into the option agreement between IdeaCast and Credit Suisse on October 15, 2007.

237.    Accordingly, IdeaCast breached its express contractual obligation in Section 5.1(a) of the First Amended Investors' Rights Agreement by failing to provide any, let alone 30 days, prior notice of the issuance of New Securities to Credit Suisse.

WHEREFORE, Plaintiffs seek entry of judgment in their favor and against IdeaCast declaring their purchases of stock to be void and rescinded, and directing IdeaCast to return to the LaRocques not less than $1,100,000.00 together with prejudgment interest and the costs of this action;  alternatively, the LaRocques seek

entry of judgment in their favor and against IdeaCast in the amount of not less than

$1,100,000.00 together with prejudgment interest and the costs of this action, and

such other and further relief as the Court may deem just and necessary.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:        August 18, 2008                    Respectfully Submitted,

                                                 JOHN P. LAROQUE
                                                 MICHAEL D. LAROQUE


                                                 By:____/s/Thomas J. Cunningham____
                                                       Thomas J. Cunningham,
                                                       One of their attorneys

Thomas J. Cunningham (ARDC No. 6215928)
Susan Chusyd (ARDC No. 6294663)
Sally Mimms (ARDC No. 6290252)
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, Illinois 60606
Tel. 312-443-0600